# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

GRUPPO ESSENZIERO ITALIANO, S.P.A. :
:
:
v. : Civil No. CCB-08-65
:
:
AROMI D'ITALIA, INC. :
:
:

## MEMORANDUM

Gruppo Essenziero Italiano, S.p.A. ("GEI") has sued Aromi D'Italia, Inc. ("ADI") for trademark infringement, unfair competition, and breach of the parties' exclusive distributor agreement. ADI has counterclaimed, asserting breach of the same agreement and several tort claims and seeking an accounting. Now pending before the court is a motion for partial summary judgment filed by counter-defendant GEI as to Counts I, II, V, VI, and a portion of Count VII of the counterclaim. The issues in this case have been fully briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the following reasons, GEI's motion will be granted as to Counts II, V, and VI; and denied as to Counts I and VII.

## BACKGROUND

The facts giving rise to this case center around an exclusive distributor agreement signed by the parties on April 22, 2000. The agreement made ADI the exclusive distributor of GEI's gelato mix and ingredient products in the United States for a period of 10 years. Under the agreement, ADI was required to pay half of a purchase invoice within 60 days of shipment and the balance of the invoice within 90 days of shipment. The agreement also allowed GEI to

1

terminate the agreement for monetary default without giving ADI an opportunity to cure.

The parties began conducting business under the exclusive distributor agreement in 2000. From May 2003 through December 2003, however, ADI failed to pay numerous invoices for products it ordered and received from GEI. Whether because of ADI's nonpayment or for some other reason, in early 2004 the parties mutually agreed to change the terms of payment under the exclusive distributor agreement. Going forward, ADI still was required to pay half of the purchase price of an invoice within 60 days of shipment, but was required to pay the remaining balance before the goods cleared customs. (*See* B. Ghazarian Dep. 73:4-76:19, Mar. 25, 2009.) Although ADI paid in full all invoices issued under this arrangement, the unpaid invoices from 2003, which allegedly amounted to €906,050.73, remained outstanding. (*See* May 7, 2004 Fax, GEI Ex. 10.)

From 2004 through 2007, the parties attempted on a number of occasions to negotiate a repayment plan for ADI's outstanding balance. These attempts were often complicated by disputes over the amount due on the unpaid invoices, with ADI consistently claiming that GEI owed it credits against its outstanding balance accrued from other dealings between GEI and ADI. The first attempt by the parties to negotiate a repayment plan occurred in March 2004 at a trade show in New York City. Boris Ghazarian, president of ADI, met with GEI representatives, including Filippo Ferrero, operations manager for GEI, to discuss ADI's outstanding debt. At a dinner meeting, Mr. Ghazarian allegedly insisted that before ADI could pay the outstanding invoices from 2003, GEI needed to give ADI credit for various invoice errors made by GEI in the past. (P. Perry Dep. 77:17-78:13, Nov. 17, 2008.) On June 1, 2004, Cristiano Ferrero, owner of GEI, sent Mr. Ghazarian an email that proposed an arrangement for ADI to repay its

outstanding debt to GEI. Mr. Ferrero suggested that ADI add 30% to each new invoice it paid, and the extra payment would be deducted from ADI's outstanding balance. (June 1, 2004 Email, GEI Ex. 11.) Because Mr. Ghazarian believed that such an arrangement would result in overpayment to GEI, the parties agreed to discuss an alternative repayment plan at a later date. (B. Ghazarian Dep. 50:13-52:7, Mar. 25, 2009.) The parties did not meet again until January 2005, at ADI's offices in Glen Burnie, Maryland. At that meeting, Filippo Ferrero met with Mr. Ghazarian and Patrick Perry, an employee of ADI, to discuss ADI's outstanding debt and a possible repayment plan. The parties again failed to reach an agreement on repayment, but continued to carry on their business under the exclusive distributor agreement.

On May 6, 2006, Mr. Ghazarian sent a letter to Filippo Ferrero proposing a repayment plan under which ADI would pay $3,000 per month to GEI from July 2005 through March 2006; $7,000 per month beginning March 2006; and a lump sum of $100,000 after the settlement of an unrelated litigation matter with a third party. GEI rejected this proposal as unreasonable because of the large amount of debt owed by ADI. (*See* F. Ferrero Dep. 265:17-266:12, Feb. 20, 2009.) Following Mr. Ghazarian's proposal, GEI informed ADI that it would begin assessing interest on ADI's outstanding balance. In an email to GEI dated May 14, 2005, Mr. Ghazarian objected to this assessment of interest on ADI's debt to GEI, but affirmed that ADI had no doubt it would repay its obligations to GEI. (May 14, 2005 Email, GEI Ex. 15.) Mr. Ghazarian also sent a follow-up email to GEI five days later, stating again that it had "no intention to deny or not fulfill [its] obligation towards [its] debt" to GEI. (May 19, 2005 Email, GEI Ex. 16.)

In January 2007, the parties met at GEI's manufacturing facility in Italy. At that meeting, Mr. Ghazarian offered to pay GEI $300,000 to satisfy the entire debt owed by ADI to GEI. (B.

Ghazarian Dep. 286:6-287:21, Mar. 25, 2009; F. Ferrero Dep. 82:18-84:7, Feb. 20, 2009.) GEI refused the offer. After that meeting, the relationship between the parties quickly deteriorated. In May 2007, Filippo Ferrero met with Mr. Ghazarian in Chicago for a food trade show and later the same month met in ADI's offices in Baltimore to discuss ADI's debt. During the course of those meetings, Mr. Ghazarian offered to pay GEI $300,000 over the next three years to satisfy its debt. Mr. Ferrero again rejected the offer, but offered to let ADI pay €600,000 to satisfy its debt, which GEI argued was well above that amount. (B. Ghazarian Dep. 288:12-289-21, Mar. 25, 2009.) Mr. Ghazarian rejected this offer. Mr. Ghazarian also suggested that because the parties could not appear to agree on a repayment plan or how much ADI continued to owe GEI, the parties should consult a third party to handle the dispute. (F. Ferrero Dep. 141:21-142:6, Apr. 29, 2008; B. Ghazarian Dep. 289:3-10, Mar. 25, 2009.)

On June 7, 2007, GEI, through its attorney, sent ADI a letter reminding ADI of its outstanding debt of approximately €800,000, demanding adequate assurances that ADI would pay the debt, and demanding full payment for goods before shipment. After a period of failed negotiations, on June 20, 2007, GEI sent another letter to ADI demanding payment in the amount of €1,001,472.76, which included €811,349 in outstanding principal and €190,123.76 in accrued interest, or a proposal for a reasonable repayment plan. The letter also requested a detailed accounting of any claimed credits within 10 days or a request for an extension of time. The next day ADI, through its attorney, responded to GEI's demand. ADI emphasized that it disputed the amount owed to GEI, but failed to propose a reasonable repayment plan or to provide an accounting of any claimed credits to GEI. On July 2, 2007, GEI sent a formal cancellation of the exclusive distributor agreement to ADI.

## STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## ANALYSIS

### A. Applicable Law

The United Nations Convention on the Contract for the International Sale of Goods ("CISG"), 15 U.S.C.App., 52 Fed. Reg. 6262 (March 2, 1987), governs the sale of goods between parties whose places of business are in nations that are signatories to the CISG. CISG, art. 1(1). Because the CISG does not apply to tort claims, *see Dingxi Longhai Dairy, Ltd. v. Becwood Tech. Grp., L.L.C.*, 718 F. Supp. 2d 1019, 1024 (D. Minn. 2010), the parties agree that Maryland law applies to ADI's counterclaims sounding in tort. The parties, however, dispute whether Maryland law or the CISG governs ADI's breach of contract claim, which asserts that GEI wrongfully terminated the parties' exclusive distributor agreement (Count I).[1]

Article 1 of the CISG states that the "Convention applies to *contracts of sale of goods* between parties whose places of business are in different States." CISG, art. 1 (emphasis added). Although distribution agreements are considered contracts for the sale of goods under Maryland's Uniform Commercial Code ("UCC"), courts have held that such agreements are not considered contracts for the sale of goods under the CISG. Under the UCC, a contract for the sale of goods explicitly includes both contracts relating to the present sale of goods and contracts relating to the future sale of goods. *See* Md. Code. Ann., Com. Law § 2-106(1) ("In this title unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods."); *Kirby v. Chrysler Corp.*, 554 F. Supp. 743, 749-50 (D. Md. 1982) (applying the UCC to a distributorship agreement); *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 376 (Md. Ct. Spec. App. 1983) (interpreting the UCC to apply to

---

[1] The other counts assert an accounting (Count II); negligent misrepresentation (Count V); tortious interference with business relationships (Count VI); and declaratory relief (Count VII).

distributorship contracts). Courts interpreting the CISG, however, have concluded that the law does not extend to agreements that create a framework for the future sale of goods but fail to establish specific terms for quantity and price. *See, e.g.*, *Amco Ukrservice v. American Meter Co.*, 312 F. Supp. 2d 681, 686-87 (E.D. Pa. 2004).[2] Indeed, Article 14 of the CISG specifies that a proposal for entering into a contract does not constitute an offer unless it contains sufficiently definite terms for determining the price and quantity of the goods. CISG, art. 14(1).

Acknowledging that courts have refused to apply the CISG to disputes arising from the breach of a distribution agreement, ADI argues that the CISG should nonetheless apply to each individual purchase order and sale concluded by the parties under their distribution agreement. (*See* ADI's Opp'n at 29 (citing M. Killian, *CISG & the Problem with Common Law Jurisdictions*, 10:2 J. Transnational Law & Policy 217, 237 (Spring 2001)). Even if ADI is correct, and the CISG applies to the individual purchase orders and sales conducted between the parties, ADI does not seek damages in Count I for the breach of a particular order. Instead, ADI seeks damages for GEI's alleged wrongful termination of the exclusive distribution agreement. The CISG therefore does not govern ADI's breach of contract claim in Count I, and Maryland law applies.[3]

### B. Breach of Contract (Count I)

In Count I of the counterclaim, ADI alleges that GEI wrongfully terminated the parties' exclusive distributor agreement. GEI has moved for summary judgment on the grounds that the

---

[2] *See also Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02-4635, 2006 WL 1519981, at *7 (S.D.N.Y. June 1, 2006) and *Viva Vino Import Corp. v. Farnese Vini S.R.L.*, No. 99-6384, 2000 WL 1224903, at *2 (E.D. Pa. Aug. 29, 2000).

[3] The parties agree that if the CISG does not govern ADI's breach of contract claim, Maryland law applies. (*See* ADI Opp'n at 29.)

7

terms of the exclusive distributor agreement gave it the right to terminate the agreement if ADI was in material monetary default. ADI has opposed the motion.

The parties' exclusive distributor agreement states that either GEI or ADI could terminate the agreement

> . . . [i]f either party materially defaults in its obligations under this Agreement. However, if one party defaults, then the other shall give notice of the default and give the defaulting party a period of sixty (60) days to cure the default. This cure period shall not apply to a monetary default.

(Exclusive Distributor Agreement at 5, GEI Ex. 7.) Under these terms, GEI could terminate the agreement for monetary default without giving ADI an opportunity to cure, which it did on July 2, 2007. At the time of the termination, GEI alleged that ADI owed an outstanding balance of €811,349, in principal, and €190,123.76, in accrued interest, on unpaid invoices dated from May 2003 through December 2003. (Seidl Letter at 1, GEI Ex. 21.)

ADI concedes that it failed to pay invoices for products it received from GEI from May 2003 through December 2003. It argues, however, that there is a material dispute regarding whether ADI remained in default on those invoices in 2007, when GEI terminated the agreement. ADI alleges that during the course of the parties' seven year relationship, GEI agreed to "credit" ADI's account for nonconforming and sample products, trade show cost reimbursements, payments to third parties, and invoicing errors. ADI alleges that the "credits" it accrued from GEI significantly reduced its outstanding balance on the unpaid invoices from 2003, and may even have entirely set-off any remaining debt ADI owed to GEI.

GEI argues that, as a matter of law, ADI may not off-set the debt it owes from the 2003 invoices with credits it allegedly earned from various other transactions between the parties on other occasions. Section 2-717 of the UCC allows a buyer to deduct all or any part of damages

8

from a seller's breach of the contract from the amount due under the contract. *See* Md. Code. Ann., Com. Law § 2-717. It is well-established, however, that under § 2-717, "a party may not set-off a contractual claim against a debt on a separate contract." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 950 (9th Cir. 2006); *see also ITV Direct, Inc. v. Healthy Solutions, LLC*, 379 F. Supp. 2d 130, 133 (D. Mass. 2005) ("The buyer's right to set-off under § 2-717 must stem from a breach of the *same contract* under which the seller is attempting to recover his price.") (emphasis in original) (internal quotation marks omitted); *Celex Grp., Inc. v. Executive Gallery, Inc.*, 877 F. Supp. 1114, 1133 (N.D. Ill. 1995) ("The well-established rule with respect to section 2-717 of the Uniform Commercial Code . . . is that any damages a buyer seeks to set-off from the amount due under a sales contract must arise from a breach of the same contract under which the seller is attempting to collect."); *C.R. Bard, Inc. v. Med. Elecs. Corp.*, 529 F. Supp. 1382, 1387 (D. Mass. 1982) (explaining that § 2-717 "is not a general set-off provision permitting a buyer of goods to adjust its continuing contract obligations according to the equities perceived by the buyer.") (citation omitted). GEI argues that under § 2-717, each purchase order and invoice between the parties was a separate contract. ADI therefore cannot set-off the amount due on the unpaid invoices from 2003 with credits it earned from alleged breaches by GEI on invoices issued either before May 2003 or after December 2003.

It is unclear, however, whether ADI is even attempting to invoke § 2-717. There is no evidence on the record to suggest that ADI informed GEI of its intention to invoke the UCC provision, which is required. *See* Md. Code. Ann., Com. Law § 2-717. ADI also does not appear to rely on § 2-717 in its opposition to GEI's motion for summary judgment. Instead, ADI appears to argue that the parties contracted around the UCC's default rules when GEI agreed to off-set

9

ADI's unpaid balance from the 2003 invoices with credits from other sales contracts.

Although the exclusive distributor agreement does not expressly provide for payment of past invoices by "credits" on other sales contracts, ADI has presented evidence that it was the parties' course of performance to apply "credits" from separate sales contracts against past invoices. *See* Md. Code Ann., Com. Law § 2-202 (explaining that an agreement between parties may be "explained or supplemented" by the parties' course of performance). Section 2-208 of the UCC provides that:

> Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

Md. Code Ann., Com. Law § 2-208(1).

Here, there is evidence on the record that GEI routinely applied reimbursements for trade shows, reimbursements for defective or unordered products, and sales commissions owed to ADI against its outstanding balance. For example, in a fax dated May 7, 2004, GEI notified ADI that a reimbursement for a tradeshow of $25,000 and a sales commission of €16,664.80 owed by GEI to ADI would be applied as credit against ADI's overdue invoices. (*See* GEI Ex. 10). GEI similarly credited ADI's account for a sales commission totaling €7,047.70 on November 16, 2005. (*See* GEI Ex. 18.) Moreover, GEI specifically stated that the sales commission would be applied against the outstanding balance remaining from the unpaid 2003 invoices. (*Id.*) ADI also has presented evidence that it continuously overpaid for certain products that GEI had agreed, but failed, to provide at a 35% discount. (*See, e.g.*, B. Ghazarian Dep. 31:6-40:7; 98:4-9; 100:13-21, Mar. 25, 2009; J. Sullivan Dep. 29:12-31:4, Dec. 4, 2008.) Although GEI disputes whether the parties agreed to such a discount, at this stage, the facts must be construed in ADI's favor.

Mr. Ghazarian testified in his deposition that GEI not only agreed to such a discount, but also agreed to apply any amount that ADI overpaid on products that should have been discounted at 35% against ADI's unpaid invoices from 2003. (B. Ghazarian Dep. 114:13-116:12, Mar. 25, 2009.) These facts suggest that parties engaged in a course of performance in which GEI routinely applied credits owed to ADI against its unpaid balance from 2003. The parties disagree, however, on how many credits ADI is entitled to claim and the amount still owed on the unpaid balance from the 2003 invoices. Thus, there is a material dispute of fact regarding whether ADI was in monetary default in 2007 and whether GEI had the right to terminate the exclusive distributor agreement.

GEI argues, in the alternative, that its right to terminate the exclusive distributor agreement arose because ADI failed to provide adequate assurances that it would pay its outstanding debt or to otherwise respond to GEI's June 20, 2007 letter demanding payment. Section 2-609 of the UCC states that "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance." Md. Code Ann., Com. Law § 2-609(1). The failure by a party to provide adequate assurances after such a reasonable demand is made is considered a repudiation of the contract. *Id.* § 2-609(4). Because reasonable grounds for insecurity between merchants must be determined according to commercial standards, whether a party has reasonable grounds for insecurity is generally a question of fact, *see In re Lone Star Indus., Inc., Concrete R.R. Cross Ties Litigation*, 776 F. Supp. 206, 228 (D. Md. 1991), and the standard for establishing reasonable insecurity as a matter of law is therefore high. *Id.*

In this case, there is a dispute of material fact whether GEI had reasonable grounds to

11

believe that ADI would not pay its outstanding debt. The facts suggest that GEI became nervous about ADI's intent to repay its outstanding debt following Filippo Ferrero's meeting with Mr. Ghazarian in May 2007. According to Mr. Ferrero, Mr. Ghazarian's suggestion that a third party might be required to determine how much ADI continued to owe GEI on its outstanding balance made him fear for the first time that ADI was not willing to pay its outstanding debt. (F. Ferrero Dep. 141:21-142:6, Apr. 29, 2008.) Over the course of the parties' relationship, however, Mr. Ghazarian repeatedly emphasized that ADI had every intention of repaying its debt to GEI. (*See, e.g.*, Dec. 7, 2004 Letter, GEI Ex. 12; May 6, 2005 Letter, GEI Ex. 14; May 14, 2005 Email, GEI Ex. 15; May 19, 2005 Email, GEI Ex. 16.) Indeed, even when the parties' relationship began to sour in 2007, Mr. Ghazarian offered to pay GEI at least $300,000 towards its debt over the course of three years. (*See* B. Ghazarian Dep. 288:12-289:15, Mar. 25, 2009.) ADI also had paid all of its invoices from 2004 through 2007 on time and in full. Based on these facts, a reasonable jury could find that GEI did not have reasonable grounds to believe that ADI had no intention of paying any outstanding debt. GEI's motion for summary judgment on Count I must therefore be denied.[4] GEI's motion for summary judgment on a portion of Count VII of the counterclaim, which is premised on ADI's allegation that GEI improperly terminated the exclusive distributor agreement, also will be denied.

    **C.    Accounting (Count II)**

In Count II of the counterclaim, ADI requests a complete accounting of the credits GEI acknowledges were due to ADI throughout their seven-year relationship. As an initial matter, the court notes that "[a]ccounting, as a device of equity, is not frequently granted by courts in actions

---

[4] In light of this denial, the court will not address ADI's other arguments opposing summary judgment.

12

for damages." *Pitman v. Aran*, 935 F. Supp. 637, 647 (D. Md. 1996). In Maryland, an accounting:

> may be had where one party is under an obligation to pay money to another based upon facts and records which are known and kept exclusively by the party to whom the obligation is owed, or where there is a confidential or fiduciary relation between the parties, and a duty rests upon the defendant to render an account.

*P.V. Props., Inc. v. Rock Creek Village Assocs. Ltd. P'ship*, 549 A.2d 403, 409 (Md. Ct. Spec. App. 1988) (citing *Gianakos v. Magiros*, 208 A.2d 718 (1965)). None of these circumstances are present in this action.

Although ADI was obligated to pay money to GEI, there is nothing on the record to show that the facts and records regarding payment were "known and kept exclusively" by GEI. Indeed, Mr. Ghazarian testified at his deposition that he believed he had all the documents and invoices from which ADI could have calculated the amount of credit it believed it was owed. (*See* B. Ghazarian Dep. 164:4-11, Apr. 30, 2008.) GEI is not obligated to provide records regarding credits that ADI believes it is owed merely because ADI has opted not to retain them. *See Johnson v. Bugle Coat, Apron & Linen Serv., Inc.*, 60 A.2d 686, 689 (Md. Ct. Spec. App. 1948) (declining to order an accounting where the plaintiff believed it overpaid for goods because the plaintiff had the capability to compare the goods received to itemized bills). ADI also has produced no evidence that a fiduciary or confidential relationship existed between ADI and GEI. Accordingly, GEI's motion for summary judgment on Count II of the counterclaim will be granted.

### D. Negligent Misrepresentation (Count V)

In Count V of the counterclaim, ADI alleges that GEI negligently misrepresented that it would apply credits ADI earned from GEI against its unpaid invoices from 2003 and that GEI

would participate in negotiations to determine how much, if anything, ADI continued to owe to GEI. To establish a claim for negligent misrepresentation under Maryland law, a plaintiff must prove:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserted a false statement; (2) the defendant intended that the statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, took action in reliance on the statement[;] and (5) the plaintiff suffered damage proximately caused by the defendant's negligence.

*Swinson v. Lords Landing Village Condominium*, 758 A.2d 1008, 1016 (Md. 2000).

In Maryland, "[t]he mere negligent breach of contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort." *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 759 (Md. 1986) (quoting *Heckrotte v. Riddle*, 168 A.2d 879 (1961)). Maryland courts, however, have held that tort duties may arise out of contractual relationships in certain narrow circumstances. In *Jacques*, the Maryland Court of Appeals explained that "[w]here the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability." *Id.* This "intimate nexus" may be satisfied by contractual privity. *See, e.g.*, *Giannaris v. Cheng*, 219 F. Supp. 2d 687, 695 (D. Md. 2002) (holding that the defendant had a duty to tell the truth in negotiations about proposed investment and the plaintiff's employment in the business); *Weisman v. Connors*, 540 A.2d 783, 793 (Md. 1988) (holding that the owner of a business owed a duty of care to an employee it was signing to a long-term employment contract when it lured that employee away from an existing employment relationship); *Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534, 539 (Md. 1982) (seller of a car dealership was found to have a duty not to misrepresent the financial condition of

the dealership in a contract for the sale of the business).

On the other hand, courts in this district have attempted to limit remedies to contract law where the loss is purely economic and the parties engaged in arms-length commercial bargaining, particularly with contracts for the sale of goods. *See, e.g.*, *Rotorex Co., Inc. v. Kingsbury Corp.*, 42 F. Supp. 2d 563, 575 (D. Md. 1999) (dismissing a negligent misrepresentation claim in a contract for the design and manufacturing of an automated assembly system because the parties were sophisticated and had allocated their risks and limited their remedies through lengthy contract negotiations); *Blue Circle Atlantic v. Falcon Materials, Inc.*, 760 F. Supp. 516, 519 (D. Md. 1991) (dismissing purchaser of cement's negligent misrepresentation claims where the losses were purely economic); *21st Century Props. Co. v. Carpenter Insulation & Coatings Co.*, 694 F. Supp. 148, 151 (D. Md. 1988) (imposing no duty of care on the defendant under a contract for the sale and installation of foam roofs where both parties were equally sophisticated in the ways of business); *Flow Indus., Inc. v. Fields Constr. Co.*, 683 F. Supp. 527, 530 (D. Md. 1988) ("Where . . . the controversy concerns purely economic losses allegedly caused by statements made during the course of a contractual relationship between businessmen, it is plainly contract law which should provide the rules and principles by which the case is to be governed."). The courts also have been reluctant to allow negligent misrepresentation claims to survive where remedies under contract law are sufficient to cover the plaintiff's injuries. *Boatel Indus., Inc. v. Hester*, 550 A.2d 389, 401 (Md. Ct. Spec. App. 1988) (declining to decide whether a duty in negligent misrepresentation claim extended to a yacht seller's claims about quality of product where the damages "are included within the damages recoverable under the warranty counts.").

In this case, ADI has provided no evidence to justify the imposition of a duty of care on GEI. Although the record reflects that Mr. Ghazarian's and Mr. Cristiano Ferrero's friendship gave rise to the business relationship between ADI and GEI, there is no evidence to suggest that there was a disparity in the strength of either party's bargaining positions. ADI was as equally sophisticated as GEI in the general affairs and ways of business, and ADI, like GEI, was free to define contractually its respective rights and liabilities. Moreover, ADI's loss is purely economic and can be remedied through its breach of contract claim. Accordingly, ADI's negligent misrepresentation claim must fail. GEI's motion for summary judgment on Count V will be granted.

### E. Tortious Interference with Business Relationships (Count VI)

In Count VI of the counterclaim, ADI alleges that GEI tortiously interfered with ADI's business relationships with its customers after GEI terminated the parties' exclusive distributor agreement. In Maryland, the elements of the tort of interference with a business relationship are: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss without right or justifiable cause on the part of the defendants (constituting malice); and (4) resulting in actual damage and loss. *Kaser v. Fin. Protection Marketing, Inc.*, 831 A.2d 49, 53 (Md. 2003). Under Maryland law, "[t]ortious or deliberate intent to harm a plaintiff's business relationship is not alone sufficient to support an intentional interference claim. There must also be proof that the defendant's conduct in interfering with contract or business relations was accomplished through *improper means*." *Spengler v. Sears, Roebuck & Co.*, 878 A.2d 628, 641-42 (Md. Ct. Spec. App. 2005) (emphasis in original) (quoting *Lyon v. Campbell*, 707 A.2d 850 (1998)). Thus, to recover

for tortious interference with business relationships, the plaintiff must prove that the defendant's conduct was *independently* wrongful or unlawful. *Id.* Maryland courts have defined independent "improper means" to include "violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 979 (Md. 1989) (citation omitted).

Here, ADI argues that GEI interfered with its business relationship with Harlan Fairbanks by maligning Mr. Ghazarian's character and falsely claiming that ADI owed GEI over $2 million in unpaid invoices. Even if GEI defamed Mr. Ghazarian's character, or ADI's, as alleged, ADI has failed to state a claim for tortious interference with its business relationships. "[T]o establish causation in a wrongful interference action, the plaintiff must prove that the defendant's wrongful or unlawful act caused the destruction of the business relationship which was the target of the interference." *Med. Mut. Liab. Soc'y of Maryland v. B. Dixon Evander & Assocs., Inc.*, 660 A.2d 433, 439 (Md. 1995). The undisputed facts show that Harlan Fairbanks ended its business relationship with ADI for reasons unrelated to any defamatory remarks that GEI representatives allegedly made about Mr. Ghazarian or ADI. Gordon Sigurdson, president of Harlan Fairbanks, stated that the reasons why ADI and GEI ended their business relationship was not of interest or concern to him, and that he did not want to get involved with their dispute because he envisioned doing business with both companies in the future. (G. Sigurdson Dep. 21:19-22:20, Apr. 27, 2009.) Mr. Sigurdson further testified that Harlan Fairbanks eventually was forced to terminate its dealings with ADI because an employee of Harlan Fairbanks left the company to join ADI as a competitor and because Mr. Ghazarian refused to deliver products

ordered from ADI to Harlan Fairbanks. (*Id.* at 67:16-68:5; 68:21-69:10.) ADI has offered no evidence to suggest that Harlan Fairbanks ended its business with ADI because of allegedly defamatory statements made by GEI as opposed to the reasons stated by Mr. Sigurdson. Accordingly, GEI's motion for summary judgment on Count VI will be granted.

## **CONCLUSION**

For the foregoing reasons, GEI's motion for summary judgment will be denied as to Count I and a portion of Count VII, and granted as to Counts II, V, and VI. A separate Order follows.

July 27, 2011 /s/
Date Catherine C. Blake
United States District Judge